Filed 4/1/14  In re Evelyn H. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re EVELYN H. et al., Persons Coming Under Juvenile Court Law. | B253817 |
| _____ | (Los Angeles County Super. Ct. No. CK88230) |
| J.H., | |
| Petitioner, | |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDING.  Petition for extraordinary writ.  (Cal. Rules of Court, rule 8.452.)  Marilyn Kading Martinez, Commissioner.  Petition denied.

Los Angeles Dependency Lawyers, Inc., Law Office of Marlene Furth, Danielle Butler Vappie and Carolina Villamil for Petitioner.

No appearance for Respondent.

Office of the County Counsel, John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jeanette Cauble, Deputy County Counsel, for Real Party in Interest.

_____

J.H. (father) has filed a petition for extraordinary writ (Cal. Rules of Court, rule 8.452) challenging the juvenile court's order setting a hearing pursuant to Welfare and Institutions Code section 366.26.[1]  We deny the petition.

## FACTS AND PROCEDURAL HISTORY

On December 3, 2012, the Los Angeles County Department of Children and Family Services (DCFS) filed a section 300 petition concerning the four children of Melody H. (mother).  At that time, the children were ages five, three, two and one.  DCFS alleged that mother had hit one of the children with a shoe, had a violent altercation with a maternal aunt in the children's presence, had a history of substance abuse, including methamphetamine, and currently abused alcohol and marijuana.  DCFS alleged that father had failed to provide the children with the necessities of life.

The family had most recently come to DCFS's attention via a referral on August 23, 2012.  At that time, mother told DCFS that J.H. was the biological father of her two youngest children, Evelyn and Jacob.  Mother said that father had not had any contact with the children for six months, and although he would call to see how they were doing, he did not visit them.  Mother said that father lived in Tijuana, Mexico.  In its detention report, DCFS listed father's whereabouts as "unknown."

On November 30, 2012, DCFS initiated a due diligence search request for father.  DCFS had four possible addresses for father but he did not live at any of them.

_____

[1]	All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

DCFS conducted another due diligence search in anticipation of the jurisdiction/disposition hearing on January 3, 2013. At that time, DCFS still listed father's whereabouts as "unknown." Although DCFS sent notices to mother and to the father of her two older children, DCFS did not send any notices to father. Father did not appear for the jurisdictional hearing on January 3, 2013. The juvenile court found that notice had been given as required by law, sustained the section 300 petition, as amended, and declared all four children to be dependents of the court. However, the court declined to make any paternity findings at that time. The clerk of the juvenile court mailed a certificate of the court's minute order to mother at her last known address. The clerk's certificate listed the address of each father as "unknown."

On February 6, 2013, DCFS filed a subsequent petition (§ 342), adding allegations against mother, but not against either father. At that time, mother claimed she did not have any information about father, nor did DCFS have any contact information for him.

In its report prepared for the March 12, 2013, jurisdiction/disposition hearing on the subsequent petition, DCFS reported that father was living on Mace Place in Los Angeles. DCFS sent a notice of that hearing to father at the address on Mace Place.[2] DCFS recommended that neither father be offered reunification services. The juvenile court continued the hearing several times, and sustained the subsequent petition, as amended, on May 13, 2013.

Father made his first juvenile court appearance at the six-month status review hearing on November 7, 2013. Steve Lory, an attorney from Los Angeles Dependency Lawyers 2 (LADL2), informed the court that he was available for appointment for father, but requested that if he were appointed, his appearance be a special appearance only because there were several issues, including notice, that needed to be investigated. The court continued the matter to January 14, 2014. The court's minute order indicated that Mr. Lory was making a special appearance for father.

---

[2] At the six-month review hearing on January 14, 2014, father told the juvenile court he had never lived on Mace Place.

DCFS prepared a status review report in anticipation of the January 14, 2014 hearing. DCFS interviewed father on December 31, 2013. At the time of his interview, father was living in Wilmington. Father said he was interested in caring for his children, but the place where he was staying was not suitable for them. When asked how he would provide for the children financially, father replied that he had no job. Father had not visited the children since they had been placed in their current foster home. DCFS opined that it would not be in the children's best interest to give father reunification services because of his unstable living arrangements and lack of income.

On January 14, 2014, father appeared in juvenile court for the continued six-month hearing. Attorney Carolina Villamil of LADL2 made a special appearance on behalf of father. Father informed the court that he had spoken with the social worker, who recommended that he ask "you guys" for visitation rights. Father told the court he would like to visit with his children because he had not seen them in months. When the court asked father when he thought he had last seen the children, he said it was "before April" 2013. When asked how many times he had visited Jacob during Jacob's life, father replied, "I had him for one month, and then she [mother] told me she had court." Mother told him she had not appeared "at two courts already, . . . and then I find out [a] couple months later . . . they've been detained since April [in] foster care." The court confirmed that it had not made any paternity findings and that father was the alleged father of Evelyn and Jacob. Father said he had been at the hospital for Evelyn's birth but "didn't make it to Jacob's." The court found father was the alleged father of Jacob and the presumed father of Evelyn.[3] The court made the latter finding at the request of Ms. Villamil. The court also found the Indian Child Welfare Act did not apply to father, who informed the court that he had no Native American heritage. The court terminated reunification services for mother (whose whereabouts were then unknown). The court ordered that father have monitored visitation with the children at the social worker's office, once every other month. The court commented that although LADL2 did not

---

[3]    Father is listed on Evelyn's birth certificate but not Jacob's.

presently represent father, if LADL2 later did undertake to represent father "they should file a [section] 388 petition seeking appointment and asking for any modification of orders that I'm not modifying today.  I am authorizing the visitation."  The court ordered father to keep the court informed of his whereabouts, and directed Ms. Villamil to give father a copy of the appropriate form.  The court advised father that if he changed his address and did not keep the court informed of his current address, "the court could proceed in your absence and resolve issues against you, including terminating your parental rights."  Later on in the hearing, father said he had been living in shelters for over a year until he moved to Wilmington two months before the hearing.  Father said he had been "relocating for years already.  Never been stable."  Father also asked if he "could get some family reunification services so I could get some help."  The court denied the request, stating, "We are beyond reunification."  The court ordered father to return to court on February 27, 2014.

Addressing Ms. Villamil, the juvenile court stated:  "I will have an expectation that you will know on that date whether or not you're going to accept appointment, and if you are, you now have a month and a half.  I'm urging you to make that decision rapidly, and if you're going to seek appointment, perhaps file an attorney order asking that you be formally appointed so I can do that forthwith.  And then I will expect that you will have reviewed the file and be prepared to make specific requests."  At the conclusion of the hearing, father asked that his visitation be increased to once a month.  The court declined the request because the children did not have any relationship with father.  The court said it could reconsider that ruling at the February 27, 2014 hearing, after father had at least one visit.

**DISCUSSION**

Father first contends the juvenile court deprived him of counsel, in violation of section 317, subdivision (b).[4] Equating Mr. Lory's special appearance with a formal appointment, father claims that the court appointed LADL2 to represent him on November 7, 2013, then changed "not only the nature of father's appearance by asking father questions directly instead of through counsel," but withdrew an appointment it had "made more than two months prior."

The record does not support father's argument. At the November 7, 2013 hearing, attorney Lory informed the juvenile court that he was "available for appointment for the father but specially appearing." Mr. Lory stated that "we haven't done anything because it looks like there are some notice issues that need to be investigated. We would just ask that today if we are appointed, that it just be a special appearance so we can investigate a lot of these issues." Contrary to father's claim, the court did not appoint counsel for him at that time.

On January 14, 2014, Ms. Villamil informed the juvenile court that she was "specially appearing on behalf of [father]." Ms. Villamil did not ask to be formally appointed as father's counsel. When the court continued the matter to February 27, 2014, the court informed Ms. Villamil it expected that "you will know on that date whether or not you're going to accept appointment . . . . I'm urging you to make that decision rapidly, and if you're going to seek appointment, perhaps file an attorney order asking that you be formally appointed so I can do that forthwith." Ms. Villamil did not respond, and, more to father's point here, did not claim the court had "revoked" any prior appointment.

---

**4**     Section 317, subdivision (b) provides: "(b) When it appears to the court that a parent or guardian of the child is presently financially unable to afford and cannot for that reason employ counsel, and the child has been placed in out-of-home care, or the petitioning agency is recommending that the child be placed in out-of-home care, the court shall appoint counsel for the parent or guardian, unless the court finds that the parent or guardian has made a knowing and intelligent waiver of counsel as provided in this section."

Father speculates that, had the juvenile court formally appointed LADL2 to represent him prior to setting the section 366.26 hearing, counsel would have been able to file a formal motion challenging the court's jurisdiction over father based on lack of proper notice. Father claims he has been prejudiced by the lack of a formal appointment of counsel because his burden *after* the setting of a section 366.26 hearing is far more cumbersome than if the juvenile court had addressed the matter prior to calendaring a selection and implementation hearing. However, counsel did not seek formal appointment prior to the selection and implementation hearing. As the court noted, father can raise any notice issues (and seek the formal appointment of counsel) by way of a petition pursuant to section 388.

Father has failed to demonstrate that he was deprived of effective assistance of counsel as a result of having counsel appear specially. We agree with DCFS that father had the benefit of the assistance of counsel even though counsel appeared specially at the January 14, 2014 hearing. Ms. Villamil advised the juvenile court that father was requesting visitation with the children, requested visitation for father more than once every other month (the amount the court originally set), requested that father be found to be the presumed father of Evelyn (a request the court granted), and assisted father by providing him with appropriate forms to keep the court apprised of his current address, and presumably, discussed father's appellate rights with him.

## DISPOSITION

The petition for extraordinary writ is denied. This opinion is made final forthwith as to this court.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, J.
                    ASHMANN-GERST

We concur:

_____, P. J.          _____, J.
          BOREN                                      CHAVEZ

7